**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 11-cv-01500-WJM-MJW

ALVA MESSER,

      Plaintiff,

v.

HI COUNTRY STABLES CORPORATION

      Defendant.

---

**AMENDED ORDER DENYING IN PART AND GRANTING IN PART
MOTION FOR SUMMARY JUDGMENT**

---

This matter is before the Court on Defendant's Motion for Summary Judgment. (ECF. No. 41.)  Plaintiff Alva Messer ("Plaintiff") has filed a Response to this Motion (ECF No. 42.) and Defendant Hi Country Stables Corporation ("HCS" or "Defendant") has filed a Reply. (ECF No. 45.)  The Motion is ripe for adjudication.

Having reviewed the briefs and the relevant portions of the record, the Motion for Summary Judgment is granted in part and denied in part.

### I.  BACKGROUND[1]

**A.     Factual Background**

On July 16, 2009, Plaintiff Alva Messer purchased a guided horseback ride from Hi County Stables. (ECF No. 41 at 3.)  Defendant HCS operates commercial horseback riding at Glacier Creek Stables in Rocky Mountain National Park ("RMNP"). (ECF

---

[1] On the instant Motion, the Court must view the facts in the light most favorable to Plaintiff. *McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir.2010).

No. 41 at 7.) HCS is one of two equestrian companies owned by Rex Walker. (*Id.*) The other equestrian company is Sombrero Ranches, Inc. ("SRI"). (*Id.*) Before beginning any guided horseback ride, both companies require customers to sign an exculpatory contract, titled "Release" (hereafter "the Release" or "Release Forms"). (*Id.*) The Release Forms for HCS and SRI are identical, except for the name of the company being released from liability. (*Id.* at 4.) The Release Forms for HCS and SRI are printed in tablets containing 100 tear-away forms per tablet. Once printed, the printing company delivers the tablets to the offices of HCS and SRI. (*Id.*)

At the start of the 2009 riding season, one tablet of Release Forms labeled SRI was placed in a box of office supplies for delivery to HCS. (*Id.* at 5.) For reasons that are unexplained by Defendant, those same Release Forms—which Released SRI from liability—were used by HCS at Glacier Creek Stables on July 16, 2009. (*Id.* at 5; *see also*, Exh. C, Walker Dep. at 29:13 – 30:5.)

Typically, when customers arrive at HCS, they are informed that they must sign a Release. (*Id.* at 6; Exh. D, Marshall Dep. at 29.) Amongst other employees at HCS, Dallas Marshall informs customers that they are required to sign the Release and "mark their riding ability." (*Id.*)

When the Messers arrived at HCS on July 16, 2009, Marshall followed her normal practice and informed the Messers of the Release. (*Id.*) She also requested that they indicate their riding ability, which Plaintiff did. (*Id.*) Following this, and before commencing the guided horseback ride, Plaintiff signed the Release. (*Id.*) The Release expressly provides that the customer "understands. . .the specific risks. . .arising from riding a horse. . .and that the [customer] nevertheless intentionally agree[s] to assume

these risks." (ECF No. 41, Exh. A.)

After signing the Release, Plaintiff entered the corral where she was assigned her horse before commencing the trail ride. (*Id.* at 8; *see also*, Exh B, Alva Messer Dep. at 35:16-24). The wrangler who led the guests on Plaintiff's trail ride was Terry Humphrey. (*Id.*)

Plaintiff encountered problems with her saddle during the trail ride which required adjustment by Plaintiff and Humphrey. (ECF No. 41, Exh. B, Alva Messer Dep. at 49:1 – 50:1; Exh., Humphrey Dep. at 44:18-25; 45:7 – 46:1; 47:13-22; Exh. F, Donald Messer Dep. at 22:10-17).[2]

At the midway point, the Messer group stopped to take a rest break. (ECF No. 41, Exh. B, Alva Messer Dep. at 47:10-20). Plaintiff encountered further problems with her saddle—including slippage of the saddle to the horse's right. (*Id.* at 50:2-9)

Sometime later, as Plaintiff's horse was stepping down a "rock stair" in the trail, Plaintiff fell off the right side of the horse (the "Incident.") (ECF No. 42, Exh. E, Humphrey Dep. at 54:15- 55:10; Exh. F, Donald Messer Dep. at 27:1- 28:6.) Plaintiff allegedly sustained serious injuries and economic loss resulting from the Incident. (ECF No.1 at ¶¶ 14 and 57.)

## II. LEGAL STANDARDS

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v.*

---

[2] (*See also*, Exh. B, Alva Messer Dep. at 47:10-20; 48:2-13; Exhibit F, Donald Messer Dep. at 21:9-18).

3

*Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). A fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997). In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). With this approach of resolving factual ambiguities against the moving party, the Court, as it should, thus favors the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

### III. ANALYSIS

Defendant's instant Motion seeks reformation of the Release and moves for summary judgment as to the Plaintiff's claims—including: negligence; product liability; and, wilful and wanton conduct. If granted, Defendant argues that the Release should bar the negligence and product liability claims. The Court will first address this issue.

**A. Effect of the Release on the Negligence and Product Liability Claims**

1. Reformation

Defendant seeks to reform the Release to reflect the true intent of the parties by substituting the name HCS for SRI. (ECF No. 41 at 22.)

Reformation of a contract is an "equitable remedy, and the formulation of such remedy rests with the court's discretion." *May v. Travelers Property Casualty Co.* 2006

WL 3218852 at *2-3 (D. Colo. 2006, November 6, 2006). "Reformation of a written instrument is appropriate only when the instrument does not represent the true agreement of the parties and the purpose of reformation is to give effect to the parties' actual intentions." *Maryland Cas. Co. v. Buckeye Gas Prod. Co.*, 797 P.2d 11, 13 (Colo. 1990).[3] Mutual mistake of a contract provides grounds for reformation if the written instrument "does not express the true intent or agreement of the parties." *Segelke v. Kilmer*, 360 P.2d 423, 426-27 (Colo. 1961).

An "essential prerequisite to a court's power to reform a contract on the ground of mutual mistake is the existence of a prior agreement that represents the actual expectations of the parties and provides the basis upon which a court orders reformation." *Maryland Cas. Co.*, 797 P.2d at 13. Prior agreement must be found from the evidence presented, which must be "clear and unequivocal", and appropriate under the "circumstances." *Id. See also*, *Segelke* 360 P.2d at 426-27.

Here, Defendant asserts that the intent of the Release was to bind Plaintiff Alva Messer and Defendant HCS. Defendant contends that reference to SRI on the Release was a mutual mistake and that SRI should be substituted with HCS. The Court agrees. This holding is supported by Plaintiff Messer's own testimony, which clearly reflects the parties' common understanding of the signed document and shows acknowledgment by Plaintiff that the Release was, in fact, releasing HCS – not SRI. Such testimony is found in the following passage:

> Q. You were told it was a release, correct?

---

[3] Because this matter is before the Court on diversity jurisdiction, the Court applies the Colorado law. *Romero v. Int'l Harvester Co.*, 979 F.2d 1444, 1449 n. 3 (10th Cir.1992).

> A. Correct.
> Q. And did you have any conception or understanding of what that meant?
> A. Well, I assume a release is to release the people, you know, the stables.
> Q. And when you were presented this at Hi Country Stables, was it your understanding that you were releasing Hi Country [Stables]?
> A. Correct.

(Messer Deposition at 32:3-22).

Because the above testimony is clear and unequivocal, the Court finds that it reflects the parties' true intentions of the Release that the contract was between Plaintiff Messer and Defendant HCS.

Additionally, Plaintiff signed the Release at a location owned by HCS immediately before embarking on a trail ride guided by HCS employees. (ECF No. 41, Exh A.) Given that Plaintiff signed the document at HCS, it is difficult to see how the Release was intended to apply to any entity *other* than HCS.

Accordingly, the Court finds that there was mutual mistake at the time the Release was entered into. Mutual intent of the parties was to enter into an agreement whereby HCS would be released from certain claims. This provides the equitable basis to grant the relief. The Court orders that the name "Sombrero Ranches, Inc." (SRI) be deleted and substituted with "Hi Country Stables" (HCS) in the Release.

    2.    <u>Application of Release to Plaintiff's Negligence Claim</u>

As the Court has found that the Release should be reformed, the next issue is whether the Release shields Defendant from Plaintiff's negligence claim. For the reasons below, the Court concludes that it does.

To determine whether the Release bars Plaintiff's negligence claim, the Court must consider four factors: (1) the existence of a duty to the public; (2) the nature of the

service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language. *Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981).[4]

As to the first factor, Colorado law is clear that businesses engaged in recreational services do not perform services that implicate a public duty. This favors Defendant's position as to the validity of the Release. *Chadwick v. Colt Ross Outfitters, Inc.,* 100 P.3d 465, 469 (Colo. 2004).

With respect to the second factor, the Court similarly finds for Defendant because horse-back riding is "not an essential service." *Hamill v. Cheley Colorado Camps*, 262 P.3d 945, 949-50 (Colo. App. 2011) Horse-back riding is one of choice, not necessity.

As to third factor, this also cuts in favor of Defendant since there is no evidence to suggest that the Release was entered into unfairly. Instead, Plaintiff signed the Release "in consideration for the opportunity" to ride the trail led by HCS wranglers. (ECF No. 41, Exh A.) Plaintiff also indicated her riding ability. This suggests that she had ample time to review the Release and become familiar with its conditions. It is these facts, amongst others, that rebut any notion that the Release was unfair. *Bauer v. Aspen Highlands Skiing Corp.*, 788 F. Supp. 472, 474-475 (D. Colo. 1992).

With respect to the fourth factor, the Court looks to the language of the Release

---

[4] Plaintiff invites the Court to follow *Rosen v. LTV Recreational Development*, Inc., 569 F.2d 1117 (10th Cir. 1978). The Court declines this invitation because (1) Unlike this case, *Rosen* involved a lengthy waiver form. (2) *Jones* binds the Court on the facts presented in this case. *Jones* and other Colorado cases also provide precedent that post-dates *Rosen*. (3) if a release presented in a stand-alone document (such as the present) cannot be enforced, a slippery slope begins where all signed exculpatory agreements will have no legal significance. *See, Johnson v. Rapid City Softball,* 1514 N.W.2d 693, 700 (S.D. 1994) (discussing *Rosen*.)

to elicit its intent. The Court must determine "whether the intent of the parties was to extinguish liability and whether this intent was clearly and unambiguously expressed." *Heil Valley Ranch, Inc. v. Simkin*, 784 P.2d 781, 785 (Colo. 1989). Here, the test is met since the Release specifically uses the word "negligence" throughout the document. Reference to the word negligence expressly indicated that HCS would *not* be liable for such claims. Also, like the release in *Jones*, the Release in this case similarly points to the "specific risks" of property and personal injury damage that may "arise out of negligence." *Jones,* 623 P.2d at 376. Such language serves to reinforce the intent of the Release and that Plaintiff agreed to "assume such risks" during the course of the HCS led trail-ride. (ECF No. 41, Exh. A.)

In sum, the Court concludes that the Release shields Defendant from Plaintiff's negligence claim. To the extent that Defendant's Motion is directed towards that claim, the Motion for Summary Judgment is granted.[5]

    3.    <u>Application of the Release to Plaintiff's Strict Product Liability Claims</u>

In addressing whether the Release applies to Plaintiff's product liability claims, the Court finds this result is controlled by existing case law: *Boles v. Sun Ergoline*, 223 P.3d 724, 727-728 (Colo. 2010). That case held that an agreement releasing "a manufacturer from strict products liability for personal injury, in exchange for nothing

---

[5] Even if the *Jones* factors favor Defendant, Plaintiff argues that the Release is against National Park Service (NPS) policy. This argument is rejected because: (1) nothing in the NPS policy prevents Defendant from extracting a release from customers riding on NPS land; and
(2) despite its tortuous path, the Tenth Circuit case that the parties refer to ultimately affirmed Judge Kane's holding that the NPS policy did not reflect a "federal policy" against liability waivers. See, *Anderson v. Eby*, 877 F. Supp. 537, 540 (D. Colo. 1995) ("*Eby II*") and *Anderson v. Eby*, 83 F.3d 342, 345-346 (10th Cir. 1996) ("*Eby III*").

more than an individual consumer's right to *have or use* the product, necessarily violates the public policy of this jurisdiction and is void." *Id.* (*emphasis added*). The Court holds that this passage has equal application here. As distinct from the negligence claim, *Boles* provides that the Release does not shield Defendant from the strict product liability claims.

Alternatively, Defendant argues that the broad language of the Release covers product liability claims. Clause 2 provides: "that [the Customer] know[s] and understand[s] that horse riding . . . risks of . . . including the risk that [HCS]. . . may act negligently in . . . preparing or maintaining the horse . . . equipment or premises . . ." (ECF No. 41 Exh A.)   Nothing in Clause 2 suggests that the Release covers claims which involve  "leasing"  or "manufacturing" saddles used in conjunction with Defendant's trail rides, which would give rise to a products liability claim. Because exculpatory agreements are strictly construed against the party seeking exception, Defendant's argument that the Release bars this claim must fail. *Barker v. Colorado Region-Sports Car Club*, 532 P.2d 372, 377 (Colo. App., 1974.)[6]

Accordingly, Plaintiff's product liability claims are not barred by the HCS Release.[7]

---

[6] While Clause 2 refers to "equipment", this does not make the Release a waiver for products liability.  Defendant cannot have it both ways: it cannot argue on the one hand that the Release protects against products liability; then, on the other, argue that the Release—which provided the consideration for the opportunity to ride—covers a contract for the provision of services.  Note, as addressed later, there are other reasons why Defendant succeeds on the product liability claims. See, III. B.

[7] Defendant contends that a product liability claim necessarily rests upon two legal theories: negligence and strict liability. *Bradford v. Bendix-Westinghouse*, 517 P.2d 406, 413-414 (Colo. App. 1973). But there is nothing on the face of the Complaint or Plaintiff's brief that suggests that she pleads negligence theory with respect to the

### B. Merits of the Product Liability Claims

Defendant also moves for summary judgment on the merits of Plaintiff's product liability claim. In these claims, Plaintiff alleges (1) that HCS leased a defective saddle to Plaintiff by placing it in the "stream of commerce" and (2) that HCS manufactured a defective saddle that was used by Plaintiff (ECF No. 41 at 35; ECF No. 25 at ¶ ¶ 36-55.)[8] Defendant offers two alternative arguments below as to why grant of summary judgment is justified with respect to these claims. The Court will address each in turn.

#### 1. Horse-Back Riding by HCS is a Service and Does Not Give Rise to Products Liability

Defendant contends that summary judgment should be granted on Plaintiff's product liability claims because the primary purpose of the contract was the provision of a service—not a product. This, Defendant contends, does not give rise to liability in tort. (ECF No. 41 at 37.) *See, Yarbro v. Hilton Hotels*, 655 P.2d 822, 828 (Colo. 1982)

To buttress its position, Defendant relies on *Kaplan v. C Lazy U Ranch*, 615 F. Supp. 234 (D. Colo. 1985). There, Judge John L. Kane of this District Court refused to treat "a saddled horse, or a ride on a horse with a saddle" as a product. *Id.* at 238. Judge Kane held that it was incongruent with strict product liability doctrine and cited several cases that have refused to extend the concept of strict liability to "persons

---

product liability claims. (*See generally* ECF No. 25.) If anything, the brief infers that the products liability claim is limited to "strict liability law" with respect to claims three and four. (ECF No. 42 at 33-34.)

[8] These are claims three (lessor) and four (manufacturer) of the Complaint. (ECF No. 25 at ¶ ¶ 36-55.

10

rendering services."[9] *Id.* at 238 n.3. Defendant asserts that *Kaplan* has equal application here.

Plaintiff seeks to distinguish *Kaplan* by making specific reference to "SADDLE EQUIPMENT" in the Complaint. (*See* ECF No. 25 at ¶ ¶ 36- 51.) Plaintiff seeks to separate the saddle from the horse, and attempt to succeed on that basis.

The Court finds *Kaplan* persuasive. Like that case, the Court holds that a saddle (on a horse) is not a product—particularly in the context of horse-back riding services. The Court further finds Plaintiff's distinction is misplaced because it fails to appreciate that the saddle was incidental to the primary purpose of the contract. Plaintiff entered into a contract for a guided five-hour horse back ride through RMNP. This service primarily relied upon a horse (which is not a product) and a saddle (which incidental to that service).[10] Without a product, the product liability claims cannot succeed. *Yarbro* 655 P.2d at 828.

Because the saddle was only incidental to the contract for services, Plaintiff has failed to show a "trial worthy" issue as to her product liability claims. *Harper v. Mancos Sch. Dist. RE-6*, 837 F.Supp.2d 1211, 1223-24 (D.Colo.2011).

2. <u>Use of the Saddle Did Not Constitute a Lease</u>

In the alternative, Defendant argues that summary judgment is warranted on

---

[9] See, *Lewis v. Big Powderhorn Mountain Ski Corp.*, 69 Mich.App. 437 (1976) (no strict liability for the operation of a ski rope tow); *Stuart v. Crestview Mutual Water* Co., 34 Cal.App.3d 802 (1973) (no strict liability for engineers rendering professional services).

[10] Plaintiff basically concedes as much where there is admission that Plaintiff was "paying for a guided horseback ride." (ECF No. 41 Exhibit B, Alva Messer Dep. at 32:13-17).

Plaintiff's product liability claims because it is not a "seller"of a product. That is, Defendant does not fall within the definition of "seller" under the statute because Defendant is not a "lessor" of products, nor a "manufacturer". *See generally,* C.R.S. § 13-21-401; *Hidalgo v. Faagen*, 206 F.3d 1013, 1018 (10th Cir. 2000).[11] Again, the Court agrees.

Contrary to Plaintiff's position, the Court finds that Defendant does not "lease" saddles to its customers. Plaintiff signed a Release "in consideration for the opportunity to ride" a horse through RMNP. (ECF No. 41, Exh A.) The "opportunity to ride" does not create a lease. Its use is too short. Nor does it constitute ownership of the saddle itself.

Moreover, HCS cannot be considered a manufacturer because it does not manufacture saddles. (ECF No. 41, Exh. G, Humphrey Dep. at ¶11; Exh H, Walker Dep. at ¶ 8.) Plaintiff argues that the "offside billet [of the saddle] is a product and that it became defective while in the course of it distribution from the original manufacturer through Defendant to her as the consumer." (ECF No. 42 at 34-35). The Court treats this as an admission that Defendant never manufactured the billet. It also supports the finding that no product is involved in the present case.

Plaintiff has failed to show a genuine issue of fact as to whether Defendant leased or manufactured a saddle. Thus, Defendant's Motion as to both of the product liability claims is granted.

3.   Plaintiff's Argument re Blueflame Gas

Plaintiff argues that Defendant placed a defective saddle "*in the course of the*

---

[11] This argument rebuts Plaintiff's argument based on *Blueflame Gas, Inc. v. Van Hoose*, 679 P.2d 579, 590 (Colo. 1984), below.

*distribution process*" and is, therefore, liable for product liability. (ECF No. 42 at 33. (*emphasis added.*)) In support, Plaintiff heavily relies on *Blueflame Gas, Inc. v. Van Hoose*, 679 P.2d 579 (Colo. 1984). There, the defendant purchased propane from Diamond Shamrock. Defendant then transported and sold the propane directly to residential customers. A gas explosion occurred at a residential home. The plaintiff claimed, *inter alia*, strict liability based Defendant's failure to odorize the propane, making it a defective product. The Supreme Court held that a defective product must have arisen at the time of manufacture or "in the course of the distribution process" to the plaintiff. *Id.* at 590.

The Court is not compelled to find in Plaintiff's favor based on *Blueflame*.[12] The saddle in this case was not sold to Plaintiff. The saddle was not part of a distribution process. And, unlike the customers in *Blueflame*, the Court finds that Plaintiff is not permitted to pursue her product liability claim based on a "distribution process" theory.

Therefore, in addition to the reasons addressed above, Plaintiff's reliance on *Blueflame* does not save her product liability claims from summary judgment.

**C.    Merits of the Wilful and Wanton Claim**

Plaintiff's claim for wilful and wanton conduct is trial worthy. First, a waiver cannot release wilful tortfeasors (alleged or otherwise). The Release has no bearing on this claim. *Barker v. Colorado Region Sports Car Club*, 532 P.2d 372, 377 (Colo. 1974).

Second, willful and wanton conduct requires a mental state "consonant with

---

[12] Here, the Court has held: (1) that no product is involved in the contract between Plaintiff and Defendant based on *Kaplan*, and (2) that there was no leasing/manufacturing of the saddle. These alternative bases should also dispose of this issue.

purpose, intent and voluntary choice." *Brooks v. Timberline Tours*, 127 F.3d 1273, 1276 (10th Cir. 1997). Because key facts going to this mental state are disputed, Defendant is not entitled to judgment as a matter of law. For example, Plaintiff contends that Humphrey did not perform the number of saddle "checks" he asserts. (Alva Messer Dep. at 43:4-44:18; 48:3-11; 48:21-49:17.) Plaintiff also disputes whether Humphery noticed the "saddle rolling to the right" during the trail ride. (*Id.*) These examples reflect material facts ripe for jury determination. If the jury credits Plaintiff's testimony on these points, it could reasonably find that Defendant's actions were wilful and wanton.

The Court finds that Plaintiff has shown a genuine dispute of material fact as to her wilful and wanton conduct claim. As to this claim, Defendant's Motion for Summary Judgment is denied. *See Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001).

### III. CONCLUSION

Based on the foregoing, the Court hereby ORDERS as follows:

1. Defendant's Motion for Summary Judgment (ECF No. 41) is GRANTED IN PART and DENIED IN PART;

2. Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's claims for negligence and product liability;

3. The Clerk shall enter judgment in favor of Defendant on Plaintiff's negligence and product liability claims;

4. Defendant's Motion for Summary Judgment is DENIED as to Plaintiff's wilful and wanton claim; and

5. Trial will proceed solely on Plaintiff's willful and wanton claim, as previously

scheduled, on March 11, 2013.

Dated this 8th day of January, 2013

                                                BY THE COURT:

                                                William J. Martínez
                                                United States District Judge